# EXHIBIT D

```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                          ORLANDO DIVISION

  ..........................................................
                                    :
  UNITED STATES OF AMERICA,         :
                                    :    Case Number:
       Plaintiff,                   :    6:22-cr-00102-WWB-RMN-1
                                    :
  v.                                :    Orlando, Florida
                                    :    September 26, 2023
                                    :    3:48 P.M. - 6:12 P.M.
  BRIAN PATRICK DURNING,            :
                                    :
       Defendant.                   :
                                    :
  ..........................................................


              REDACTED TRANSCRIPT OF SENTENCING
          BEFORE THE HONORABLE WENDY W. BERGER
                UNITED STATES DISTRICT JUDGE

  APPEARANCES:

  For the Plaintiff:         Michael Felicetta
                             Courtney D. Richardson-Jones
                             U.S. ATTORNEY'S OFFICE
                             400 West Washington Street
                             Suite 3100
                             Orlando, Florida 32801

  For the Defendant:         Jeremy Lasnetski
                             John Gihon
                             LASNETSKI GIHON LAW
                             121 West Forsyth Street
                             Suite 520
                             Jacksonville, Florida 32202


  Proceedings recorded by real-time mechanical stenography.
  Transcript produced by computer-aided transcription.

              Stenographically reported before:
  Heather Suarez, RDR, CRR, FCRR, FPR-C, WA CCR, CA CSR
           WA CCR #23017624 | CA CSR#14538
     (407) 801-8921 | heathersuarez.usocr@gmail.com
         PO Box 3574, Orlando, Florida 32802
```

| | |
|---|---|
| 1 | **MARY-ANN DIAL:**  Thank you.  Thank you, Your Honor. |
| 2 | **THE COURT:**  And tell us your name for the record |
| 3 | first. |
| 4 | **MARY-ANN DIAL:**  I will.  I was at that place.  My |
| 5 | name is Mary-Ann Dial. |
| 6 | And do you need me to spell it or anything? |
| 7 | **THE COURT:**  No.  Unless the court reporter needs the |
| 8 | spelling. |
| 9 | **MARY-ANN DIAL:**  I say to you good afternoon, |
| 10 | Judge Berger.  My name is Mary-Ann Dial, and I am the proud |
| 11 | mother of Brian Patrick Durning, the gentleman who is seated |
| 12 | with his attorney at the defense table.  I am proud of my son. |
| 13 | I always have been.  I stand before you now to ask you to let |
| 14 | my son come home. |
| 15 | We need him home.  We need this nightmare to end. |
| 16 | This has been a nightmare for our family.  Brian has had his |
| 17 | freedom very restricted for 12 months of monitoring and then |
| 18 | had his freedom completely removed for three months in wait for |
| 19 | this day, September 26, 2023.  It has been 15 months in total |
| 20 | that his freedom has been impinged upon.  Brian has always been |
| 21 | a good man.  Always.  We need him to come home. |
| 22 | June 24, 2022, this all began; and that date was |
| 23 | 25 years to the day of my own personal nightmare.  I had breast |
| 24 | cancer, and I was undergoing a seven-hour surgery of bilateral |
| 25 | mastectomy and reconstruction beginning.  When I awoke in the |

1  recovery room, standing beside my bed was my son, Brian.  He
2  held my hand, told me he loved me.  I was in the hospital for
3  six days.  He was there every single day and most times three
4  times a day.
5          He had moved back here to be with me during this time
6  and had a job here.  He would come before work, after work, and
7  again in the evening.  He took me to my last chemotherapy
8  appointment and sat side by side with me for over two hours
9  while it was being injected into my body.
10         The day Brian turned five in 1976, he was sitting,
11 having his birthday breakfast when he suddenly started to cry.
12 I asked him what was wrong, and he said, "Well, I was just
13 sitting here thinking if I'm getting older, so are you and Dad;
14 and someday you're going to die and leave me."  I have never
15 forgotten that morning and the very profound statement that
16 came from the mouth of a five-year-old.
17         A few years later, when he was eight years old, I was
18 having a bad go of severe headaches.  Brian took it upon myself
19 to find my sister's phone number in New York and called her to
20 find out from his aunt Edie what could he do to help me out at
21 eight years old.  And we had a three-year-old at home as well.
22 I didn't know he even did that until my sister called and told
23 me.
24         Brian has always been a very deep thinker and a very
25 caring person.  When he was getting married, he and his bride

1  took me with them to Brazil, where she was from, to look for
2  venues and to make plans.  Brian took care of all my expenses,
3  including my airfare.  And I need my son to come home.
4          In 15 days from today, September 26, 2023, his dad
5  will turn 86 on October 11, 2023.  In two days from today, on
6  September 28th, his dad is going into the hospital for complete
7  shoulder replacement.  This is considered major surgery and
8  will take a minimum of three hours or more.  We need Brian
9  there with his dad, and we need him home afterwards to help his
10 dad and me.
11         In 42 days from today, September 26, 2023, his
12 stepdad will turn 66 on November 7th.
13         In 124 days from today, September 26, 2023, his mom,
14 me, will turn 77 on January 28, 2024.  I am one of seven
15 children.  I lost four of my siblings at the ages of 77, 79,
16 81, and 82.  There was another half brother at 65.  So as I
17 approach these ages, I know my door is getting closer to
18 closing.  I need and want my son home.
19         Over this past weekend on Saturday, I had to be
20 admitted -- I went to the emergency room, and I had to be
21 admitted to the hospital for high blood pressure.  At one point
22 my blood pressure was 190 over 98.  It's -- it was difficult.
23         I was just discharged from the hospital yesterday
24 morning, and I'm here now to plead for my son.  I need my son
25 home.

1    And, of course, between all of these dates will fall
2    the holidays.  I want my son home to be with us so we can
3    celebrate as a family.  Please send my son home with me.  I
4    have lived in this house since Brian was five years old.  I'm
5    still there, probably not going anyplace.  Please return my son
6    to me.
7          I thank you very much for your time, and I appreciate
8    it.  Thank you very much.  Please send my son home to me.
9          **THE COURT:**  Thank you.
10         **MR. LASNETSKI:**  We'd call Curtis Luscher to the
11   stand.
12         **THE COURT:**  Tell us your name for the record, sir.
13         **CHRIS LUSCHER:**  Good afternoon, Your Honor.  My name
14   is Chris Luscher, L-u-s-c-h-e-r.
15         I am a friend of Brian Durning's.  I've known Brian
16   for the bulk of his adult life.  We met in 1991 as students at
17   the University of Florida, and we've maintained a friendship
18   since that time.  I'm also a retired supervisory U.S. probation
19   officer.  I worked 23 years in the Western District of
20   Washington.
21         So being here today, flying across the country to be
22   here today to -- is difficult for me.  But that said, I think
23   it's really, really important for the Court to know not only
24   the nature and circumstances of the offense but the history and
25   characteristics of the defendant, Brian Durning, my friend.

1  minors.
2       And that's the person who Brian Durning is, and I
3  hope that the Court can not just see the one day in isolation
4  but the complete person and who he is.
5       Thank you for hearing me.
6       **THE COURT:** Thank you.
7       **MR. LASNETSKI:** David Hammett.
8       **THE COURT:** Tell us your name for the record, please.
9       **DAVID HAMMETT:** David Hammett, H-a-m-m-e-t-t. Thank
10 you for the opportunity of speaking.
11      Unlike Chris, I don't have the 20 years' experience
12 of speaking in a forum like this. But what I do have is
13 33 years come this December the privilege of being Brian's
14 friend. Also seated in the back are some other friends of
15 Brian's that make up, basically, for 30-something years,
16 you know, Brian's foxhole of friends.
17      I was raised by a World War II veteran, and I
18 apologize, but most of his teaching lessons to us, my brothers
19 and myself, seem to have a militaristic tint to them. But the
20 concept of a foxhole and having someone in your life, if you're
21 fortunate to make that kind of long-lasting relationship, is
22 without a doubt -- is you can't be fooled. I'm well aware of
23 Brian's strengths and weaknesses and everything in between.
24      In 33 years, like Chris had mentioned, he's been a
25 fabric and part of our lives. If I were able to send a drone

1  into about six or seven people's houses right now, you would
2  see Brian in every one of our wedding photos.  He was a
3  groomsman in every single one and all of us in his.  Children's
4  birthdays, football games, whatever -- the normal things that
5  you could imagine.
6          As you can imagine, it's difficult to sit here and to
7  hear another side that Brian -- you know, that people have an
8  opinion of.  I don't have that.  You talk about characteristics
9  and what makes someone -- I can speak to why he's my friend,
10 why I choose to keep him in my life for 33 years.
11         I am married, and I consider the greatest honor of my
12 life is being a father of three -- two daughters and a son.
13 And I wouldn't let a particle of air into my house if I thought
14 it would be disadvantaged -- you know, could harm my family.
15 But Brian has been a part of it.
16         You know, he's a little bit of a rolling stone as far
17 as his career, and he's lived in three different states.  So
18 there's been times -- there's been gaps in our -- of how often
19 I see Brian.  One thing that's constant is we try to take trips
20 every couple of years, and I just want to bring up a recent
21 example of one of the things that I admire most about Brian is
22 he has empathy.
23         We all have empathy at certain levels.  He's -- he's
24 got it in droves, certainly more than me.  I consider myself a
25 person that, you know, has empathy for people and wants

1  into about six or seven people's houses right now, you would
2  see Brian in every one of our wedding photos.  He was a
3  groomsman in every single one and all of us in his.  Children's
4  birthdays, football games, whatever -- the normal things that
5  you could imagine.
6           As you can imagine, it's difficult to sit here and to
7  hear another side that Brian -- you know, that people have an
8  opinion of.  I don't have that.  You talk about characteristics
9  and what makes someone -- I can speak to why he's my friend,
10 why I choose to keep him in my life for 33 years.
11          I am married, and I consider the greatest honor of my
12 life is being a father of three -- two daughters and a son.
13 And I wouldn't let a particle of air into my house if I thought
14 it would be disadvantaged -- you know, could harm my family.
15 But Brian has been a part of it.
16          You know, he's a little bit of a rolling stone as far
17 as his career, and he's lived in three different states.  So
18 there's been times -- there's been gaps in our -- of how often
19 I see Brian.  One thing that's constant is we try to take trips
20 every couple of years, and I just want to bring up a recent
21 example of one of the things that I admire most about Brian is
22 he has empathy.
23          We all have empathy at certain levels.  He's -- he's
24 got it in droves, certainly more than me.  I consider myself a
25 person that, you know, has empathy for people and wants

1   everybody to get along, but it's in his -- it's in his core.
2   And a recent example, we were on a trip just doing -- just
3   guys' weekend and doing stuff, and we -- a couple days in, we
4   would come back, and we'd kind of chill out in the pool and
5   just -- and something was clearly bothering Brian.  And
6   sometimes I can -- I'm the planner of the group.  I can get a
7   little busy thinking about what's next, and I don't see what's
8   happening in front of me.
9           So he kept asking questions about where we were,
10  questions I found a little bit annoying; but, clearly, he
11  didn't.  And to make a long story short, he was trying to
12  figure out -- he had a friend that wasn't in our circle,
13  someone he had met along the way, that was living in the area
14  where we were.  And I guess he fell on hard times; and,
15  unfortunately, it took his life.  And hearing Brian at that
16  moment tell us about this -- not someone that I knew
17  personally, but I know Brian.  And watching the transition that
18  he took in a weekend of fun with his buddies -- and it lasted
19  about 30 minutes -- it just made me realize, once again, that
20  he is someone that cares about other people.
21          He was questioning whether he did enough.  Was he a
22  good enough friend for this person?  And in my small world, I
23  didn't know the guy, so I was having trouble, you know,
24  matching his empathy, to be quite honest.  And, in retrospect,
25  it bothers me a little bit.  But the fact that it bothered

1   Brian is stuck with me.
2           Now, leaving out all the parts that normal friends
3   have -- he was there when my father passed away.  Of course.
4   One of our friends in the back row is even a grandfather now.
5   Brian is woven into the fabric of our friendship of this circle
6   of friends, and I don't think that's unusual.  I think most of
7   us, if we're fortunate enough, have that in our lives.  But I
8   will tell you, in the last 15 months or so, I've come to learn
9   some other things about Brian.
10          I live here locally.  I have a flexible schedule.
11  I'm an entrepreneur.  So I'm available for Brian to call me
12  pretty much all the time.  In the last year and a half, him
13  transitioning into a career in California that's in commercial
14  real estate like myself, I was able to help and mentor him.
15          And then, unfortunately, since last June, a
16  different, you know, stage of his life in the years.  And I
17  have trouble listening and trying not to fix people's problems,
18  but I can tell you the growth the last 12 months and especially
19  the last 90 days -- I've become a good listener, and I'm here
20  to tell you that even with all the things that he's having to
21  deal with, he's still -- he's still helping people.
22          I'm hearing about, you know, someone younger where
23  he's at, that he had some questions for them, that he's trying
24  to.  He's asking me about people, if I can look in his phone,
25  because he's worried about someone in California and New York.

```
 1   in their life, and that's worth noting.
 2              THE DEFENDANT:  Thank you.  I appreciate it.  Would
 3   you like me --
 4              THE COURT:  You can continue, yeah.
 5              THE DEFENDANT:  Thank you.
 6              Obviously, June 22nd, I believe it was, of this year,
 7   I've been at the Orange County correctional facilities.
 8   Obviously, I knew this was a possibility and was very thankful
 9   to be at my best, which I just discussed, spiritually,
10   mentally, physically.  Every moment studying and change created
11   in that previous year from about the -- I have taken with me.
12              While my surroundings have changed, my mindset and
13   mission have not.  And I do believe that we are not a product
14   of our surroundings; rather, our surroundings are a product of
15   us.  Every day, even -- it is challenging at times; but,
16   regardless, I still engage in reading, the meditation,
17   gratitude, and the prayer all previously discussed.
18              My future plans are very laid out and much -- much of
19   what I just already said, you know, between the work, physical,
20   the spiritual.
21              I've been -- had the opportunity and what I feel is
22   the obligation to share some of my life, if you will, with
23   some -- some of my -- we'll call them "bunkies" because, you
24   know, we have an eight-man cell, and a lot of these guys are
25   younger; and, you know, they're young enough to be my sons.
```

1  cover-up for what Brian Durning knew he had did.

2  　　　　　The defendant's refusal to take responsibility and
3  acknowledge what he did today and throughout this whole case
4  should very much concern this Court because it concerns me that
5  he's able to offend again.  And it's not a surprise.  It is
6  consistent with who he has always been.  He has never taken
7  responsibility for his failures.

8  　　　　　It's been suggested he's a successful businessman,
9  but we know that's not true.  All right?  We know that from the
10 Government's expert report and everything that was dug up on
11 him and his own filings.  I mean, when he divorced his wife
12 after this happened, he reported zero income, zero assets, and
13 she forgave a loan against him in their marital decree --
14 divorce decree because he accumulated no wealth in their
15 marriage.  His business dealings have been a failure over and
16 over again.  That's why he keeps bouncing around the country.
17 He can't make it anywhere.  He has to depend on his elderly
18 mother and stepfather to support him even today.

19 　　　　　And with regard to substance abuse, he has never
20 addressed the problem until this Court forced him to.  Five
21 separate incidents with alcohol.  You know, his friend, the
22 probation officer, talks about there's no indicators; right?
23 Five different events where he's been caught -- right? -- by
24 somebody.

25 　　　　　The first is his DUI at 25.

```
 1    of a fine in your case, but you will pay to the United States a
 2    special assessment of $100, which is due immediately.
 3              After considering the advisory sentencing guidelines
 4    and all the factors identified in Title 18 of the United States
 5    Code, the Court finds that the sentence imposed is sufficient
 6    but not greater than necessary to comply with the statutory
 7    purposes of sentencing.
 8              Mr. Durning, are there any programs that you're
 9    interested in me recommending you for while you're in custody?
10              THE DEFENDANT:  I guess the alcohol and mental
11    treatment --
12              THE COURT:  Okay.
13              THE DEFENDANT:  -- that my attorney's referring to.
14              THE COURT:  They have the RDAP program.  I don't know
15    if you qualify for that, but I'll recommend you for the RDAP
16    program or any other alcohol treatment while you're in custody.
17              Any other -- anything else?  Any vocational programs
18    or anything you're interested in me recommending you for?
19              THE DEFENDANT:  Nothing I'm aware of at this time,
20    Your Honor.
21              THE COURT:  Okay.  All right.  Is there a
22    recommendation for a particular facility?
23              MR. LASNETSKI:  May I have one moment, Your Honor.
24         (Pause in proceedings.)
25              MR. LASNETSKI:  Your Honor, we'd request a
```

1     recommendation for a facility closest to Orlando.  I think if
2     we ask for a specific facility and then they're not able to
3     send him there, then they open it up to the entire country; but
4     if the Court recommends a facility closest to Orlando, then if
5     the closest one isn't available, they'll send him to the next
6     closest one.
7               **THE COURT:**  Okay.  I will recommend you for a
8     facility in Florida that's the closest to Orlando and, if
9     nothing in Orlando, that they look to Florida before they move
10    to other states and, should they have to move to other states,
11    that they look to states adjacent to the state of Florida
12    before they send you up to Oregon or something like that.
13              The Court having pronounced sentence, does counsel
14    for Mr. Durning or counsel for the Government have any
15    objection to the sentence imposed or manner in which the
16    sentence was imposed?
17              **MR. FELICETTA:**  I have no objection, Your Honor.
18              I would just like to clarify that Your Honor set
19    standard conditions of supervision, Your Honor referring to the
20    ones in Section 5D1.3(c), and the reason I bring that up is
21    because we've had some recent litigation that because the
22    Middle District of Florida has not adopted standard conditions
23    of supervision and if Your Honor does not specifically
24    reference the Section 5D1.3(c) as the standard conditions that
25    you're referring to, then you have to read each of them to the